THWEATT *vs.* THE STATE OF GEORGIA.

1. Where the state authorizes a citizen, by joint resolution of the general assembly, to bring suit against her on certain stipulations and for a particular cause of action therein specified, the courts are restricted by those stipulations to that cause of action, and are not empowered to consider any broader equities which may exist between the parties, or the law which might apply to a different cause of action.

2. When an officer of the state surrendered his warrant on the treasury for his salary and received in lieu thereof, from the treasurer, promises to pay by the state in the form of treasury notes, which circulated as currency at the time, and suit is brought for the salary, the reception of the notes and surrender of the warrants are in law payment of the salary, no matter what may have been the understanding at the time between the officer and the treasurer, even if sanctioned by the governor. The treasurer settled with the state and was credited for the salary, and the debt for the salary was extinguished. Suit on the ultimate failure to pay the notes, according to the promises therein made, if authorized and brought, would present a different question, on which the present case will not allow the judiciary to pass.

States. Laws. Jurisdiction. Contracts. Accord and satisfaction. Before Judge HILLYER. Fulton Superior Court. October Term, 1880.

Peterson Thweatt brought his action against the state of Georgia under and in pursuance of a joint resolution of the general assembly of Georgia, to recover of the state the sum of five thousand six hundred dollars, besides interest, for his salary as comptroller general of Georgia, for the political years ending November 1st, 1862, November 1st, 1863, and November 1st, 1864, and for half of the

political year ending November 1st, 1865, at $1,600.00 per year.

The case came on for trial at the fall term, 1880, of the superior court of Fulton county.

The plaintiff introduced and read to the jury his own testimony, which was as follows :

"I was comptroller general of Georgia from the year 1859 to the year 1866.

"I was paid for my services in state bank notes up to 1st day of November, 1861. The political year began on 1st November, 1861, and on or about the 1st February, 1862, when my first quarterly salary became due, as the governor had previously let the managers of the Atlantic and Gulf Railroad have 6 per cent. bonds in place of currency which they were alone entitled to receive, to build or pay for work done on said road, and as he and myself had been engaged for months in borrowing for the state from $1,200,000.00 to $1,500,000.00 from the state banks and others, and were expecting to have to borrow about $500,-000.00 more if we could, and as the governor said that he would promise to give 8 per cent. bonds after the war to any one who would credit the state or loan her money, and as I felt that I had enough Confederate money on hand, together with my negro hire, to support myself and family during the war, I went to the state treasurer, Jones, and informed him that I would no longer receive currency for my salary, but would wait until after the war for my pay, and would then receive payment for my services in state bonds; and as the governor was having prepared a certificate or note, promising 8 per cent. bonds or specie after the war, I asked treasurer Jones to let me have them when ready for use, for me to keep as evidence to carry out my arrangement or agreement to get the bonds I wanted after the war.

"The treasurer at once stated that he did not feel authorized by himself to make any such arrangement or agreement with me, but that if I would get an executive order,

or an order from the governor authorizing such an arrangement or agreement, when ready for use, he would let me have said certificates or notes in exchange for my warrants. I went immediately or shortly thereafter to the governor and asked him for the necessary order, telling him my object, etc.   Governor Brown promised to give the necessary order to the treasurer, and did give it.   In a letter to me since then, which letter I now have in my possession, saying in almost exact words that he gave such executive order in consequence of my very valuable services in collecting old claims that had been neglected by former comptrollers general, in suggesting important amendments to our tax laws, and in my furnishing valuable statistics, etc.

"The governor having given the necessary order, about the 1st of April, 1862, when said certificates or notes were ready for use, I commenced taking the governor's warrants on the treasury, payable to myself alone, and without giving the treasurer any receipts of payment whatever on the same.   I exchanged them with him for these certificates or notes, promising state bonds, and as I would do so, I would immediately take them to the vault of the state treasury office and would there deposit them in a separate package in a tin canister, where I kept my valuable papers and money or currency.   I then exchanged my warrants and deposited these notes until September, 1864.   The next that I so deposited were the $750.00 fifteen 8 per cent., $50.00 notes numbering from 1701 to 1715, that I exchanged my warrants for, on or about the 9th of May, 1865, near two weeks after the surrender, and when they were worth nothing as a currency.

"I was paid in United States currency from the 1st of May, 1865, to the 8th of January, 1866.

In September, 1864, I became alarmed and was afraid to let my certificates or notes or evidences to obtain state bonds remain in the treasury vault, and I determined to have them buried in the ground somewhere, consequently

I went to treasurer Jones and informed him of my fear, and that I wanted him to give large notes of the same character as those I had received from him, as I wanted to hide them or bury them in a vial. I presented to him $3,000.00 worth of 8 per cents. and $2,5co oo worth of 6 per cents, in notes of fifty, twenty, ten and fives. He gave me thirty one-hundred dollar notes of 8 per cents, which he took from a large package, numbering from 7251 to 7280, and he gave me twenty-five $100.00, 6 per cent. notes, which he also took from another large package, numbering from 3520 to 3544, in place of the smaller notes. I put them in a quinine vial and sealed it up, and the same was buried, where it remained over seven years.

" The $6,250.00 notes have never been out of my possession, except while under seal, and while commissioner Smith had them for treasurer Jones to look at, before he answered interrogatories in this case. Up to 1st of August, 1864, I had received and had deposited in my tin canister, in the treasury, $6,150.00 of these certificates or notes, received on account of my salary as evidence, as the legislature in December, 1863, having increased my salary. But as when I made the arrangement or agreement with the state treasurer and governor to wait until after the war and then receive state bonds in payment of my services, I was only getting a salary of $2,000.00 per annum, I concluded not to save up more than $2,000.00 of these certificates as evidence to sustain the arrangement or agreement with the treasurer and governor. Consequently I only presented to the treasurer $5,500.00 of said certificates to get large notes to present as evidence to obtain said bonds.

" In November, 1864, and February, 1865, I also received $1,500.00 more of these notes in exchange for my warrants.

" The following is a copy of the thirty 8 per cent. notes, numbering from 7251 to 7280, received from treasurer Jones in September, 1864:

MILLEDGEVILLE, GA., January 15th, 1862.

Receivable in payment of all dues to the state, and to the Western and Atlantic Railroad.

No. 7251. The state of Georgia will pay bearer one hundred dollars. Redeemable in 8 per cent. bonds or specie six months after a treaty of peace, or when the banks of Savannah and Augusta resume specie payment, if before that time.

JOHN JONES, *Treasurer.*

*P. Thweatt, Comptroller General.*

The fifteen $50.00 eight-per cent. notes received by me in May, 1865, are of the same character, except that they are dated January 15th, 1865. The following is a copy of the twenty-five $100.00 six-per cent. notes received from treasurer Jones in September, 1864:

MILLEDGEVILLE, February 1st, 1863.

Receivable in payment of all dues to the state and to the Western and Atlantic Railroad.

No. 3520. The state of Georgia will pay bearer one hundred dollars, in specie or 6 per cent. bonds of the state, six months after a treaty of peace shall have been ratified between the United States and the Confederate States.

JOHN JONES, *Treasurer.*

*T. J. Bloodworth for Comptroller General.*

Said notes have never been paid."

Plaintiff also introduced the testimony of John Jones, who was treasurer at the time of the transaction stated by plaintiff. He corroborated the statements of plaintiff concerning them. The only portion of his testimony which is material to be set out was as follows:

" His warrants were drawn in favor of himself alone. I took no receipt when I delivered him the certificates. I gave Mr. Thweatt, in November, 1864, and February and May, 1865 in exchange for his warrants, $2,250.00 in 6 and 8 per cent. certificates. In May, 1865, I gave him in exchange for his warrants to that date, $750.00 in fifteen $50.00 notes, issued under act November 14th, 1864, to pay to civil officers. They were dated January 15th, 1865, and were numbered consecutively, as well as I re-

member. Such certificates were exchanged for Mr. Thweatt's warrants by order of Governor Brown, as already stated. He had the choice of these certificates and Confederate money, but preferred to take the certificates on the condition stated in direct answer, to-wit: To get bonds for them after the war.

"I do not recollect at this length of time the value of said treasury notes for each quarter as compared with gold, or their standing with regard to Confederate money. The difference, if any, between these notes and Confederate, was very small, according to my recollection. I do not recollect how many of said notes were outstanding or unredeemed at the surrender, in 1865."

Counsel for defendant objected to all that part of the testimony of both witnesses, which referred to conversations and agreements and intentions of the plaintiff, the treasurer and the governor of said state, with reference to the receipt of the treasury notes referred to by the plaintiff in his testimony, in exchange for his warrants; and also moved for a non-suit. The objection was sustained, and the non-suit awarded. Plaintiff excepted.

McCay & Abbott, for plaintiff in error.

Clifford Anderson, attorney general, for the state.

Jackson, Chief Justice.

We have given this case that deliberate consideration which its gravity as well as the services of the plaintiff in error with so much zeal and such industry and ability during a long period as the comptroller general of the state, demanded at the hands of her judiciary.

Speaking for myself, I wish to express sympathy for this tried and trusted servant of Georgia, whose integrity not a breath of suspicion ever sullied, and whose fealty to the state in the most trying period of her history never for an instant faltered; and I believe my brethren fully

agree with me in the expression of an earnest desire, if the law permitted it to be done, to do something in his old age and needy circumstances for his relief.

But the general assembly has so narrowed the scope of our jurisdiction and guarded the limits within which the courts may act, that we cannot do more than consider the case as made within the prescribed limits, and not move beyond them. The citizen cannot sue the state unless she consents, and if she consents on terms, those terms must be considered as part of her grant of the right, and confine her courts to the consideration of the right with the conditions thereto attached and made part and parcel of the grant. The grant is as follows :

"WHEREAS, Peterson Thweatt, former comptroller general of the state of Georgia, claims that the state is due him the amount of $6,250.00 principal, besides interest, for his salary as comptroller general for the political years 1862, 1863, 1864 and 1865 ; and

WHEREAS, said Peterson Thweatt desires to bring suit against the state for the purpose of establishing and collecting his said alleged claim, and offers to give bond and security to the state to pay all costs and expenses of the suit should he be cast therein ; therefore, be it

*Resolved, by the general assembly of Georgia,* That said Peterson Thweatt be permitted to institute suit in the county of Fulton against the state that he may, if he can do so, establish his alleged claim, and that said suit may be instituted on the following conditions :

Before entering such suit the said Peterson Thweatt shall enter into a bond with at least two good and solvent securities to be approved by the governor, which bond shall be payable to the governor or his successors in office, and shall be conditioned to pay, in the event that he is cast in said suit, all the costs of said case and also such amount of fees as the governor may pay, or contract to pay, in defending such suit, should the governor deem it necessary to employ counsel to assist the attorney general in defending such suit. That the declaration in the suit herein provided for be served on the governor under the same rules that apply to serving declarations in ordinary law suits ; that said Peterson Thweatt *shall not sue the state on any claim based on or under any law or laws that were passed during the late war between the states,* either to obtain increased pay *or the pay under said law* for his salary as comptroller general ; that the suit be tried in Fulton superior court in March or April next unless continued under

rules of law applicable to continuance of cases; that the statute of limitations shall not be pleaded by the state or by plaintiff's attorney; and that the state and plaintiff shall be bound by the issue of said case with right on part of the state to file a writ of error or to move for new trial as usual. Any verdict the said Peterson Thweatt may obtain in his favor (if any be obtained) is hereby referred to the act of any future legislature. That this resolution is not intended to have any greater effect in law than other joint resolutions that have already passed, or may hereafter be passed, by the general assembly, and that shall be signed by the governor when said resolutions were read only once or twice in each house, and when the same passed without being required to have more than a majority of the members present voting on their passage."

It is clear, from the preamble to this resolution, as well as from its entire scope, that the suit Mr. Thweatt was empowered to bring was for his salary; and the record shows that such is the suit which was brought. It is not a suit for payment of the treasury notes or bonds which the state issued during the war and in which Mr. Thweatt was paid, and which turned out to be of no value; but it is a suit for the salary—the original salary, of Mr. Thweatt. By the words italicized in the copy of the act above written (italicized by me), laws passed by the state during the war are expressly excluded from being considered by the courts. Whether or not the currency she then issued was legal is thus not before us, and we are confined to the question, did he get his salary in that currency which circulated as money, and which all other creditors of the state received as money?

It seems to have been the purpose of the general assembly to narrow the case to the single question, is the salary due to Mr. Thweatt as salary? On that point it is clear that he gave up his warrants for salary for these notes, and thereby extinguished the salary, holding the notes in its stead.

Moreover, it appears from this resolution that strict rules of law are to be applied to the case made, and within these rules the courts are confined. If broader views of

equity and right between man and man could be considered, and a case founded on such views had been brought, the conclusion might have been different; but that is not a question before us, and it is needless to go into its consideration.

The case made is a suit for the salary of the comptroller general for 1861 and the subsequent years of the war, and the question is, has that salary been paid?

It appears that Mr. Thweatt surrendered to the treasurer his warrant on the treasury for his salary, and received in lieu thereof treasury notes which circulated as currency at the time. He was thus paid in that currency. The treasurer settled with the state, and was allowed credit for the comptroller's salary as thus paid. The debt, therefore, for the salary was extinguished, and it is that debt on which suit is brought, and which alone is before us.

Any private understanding between the treasurer and the comptroller general as to the use to which the latter meant to apply the notes, even if it had been approved by the governor, could not affect the question, because such understanding could not bind the state.

Applying the rules of law to the case made, we cannot see how the court below could have ruled otherwise than to grant the non-suit. The suit is not on the notes as promises to pay at a certain time and on a contingency. Such a suit as that would present a different question, which we have no jurisdiction now to pass upon, and which we need not consider at all, as the result would be fruitless.

Judgment affirmed.